1   JOSEPH J. PERKOVICH, ESQ.
    NY Bar No. 4481776
2   Phillips Black, Inc.
3   PO Box 4544
    New York, NY 10163
4   Tel: (212) 400-1660
    j.perkovich@phillipsblack.org
5
6   AMY P. KNIGHT, ESQ.
    AZ Bar No. 031374
7   Knight Law Firm, PC
    3849 E Broadway Blvd, #288
8   Tucson, AZ 85716-5407
9   Tel: (520) 878-8849
    amy@amyknightlaw.com
10
11  Attorneys for Frank Jarvis Atwood

12

13              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ARIZONA
14

15

16  Frank Jarvis Atwood,                    No.: CV22-00625-PHX-JAT (JZB)

17                  Plaintiff,
                                            **PLAINTIFF'S RESPONSE TO**
18  v.                                      **DEFENDANTS' MOTION TO**
                                            **DISMISS [DOC. 10]**
19  David Shinn, *et al.*,

20                  Defendants.

21

22

23

24          Plaintiff Frank Atwood respectfully files this response to Defendants' Motion to

25  Dismiss and asks that this Court deny that motion.

26
                                        1

1

**FACTUAL BACKGROUND**

2

3

Frank Atwood is a devout Greek Orthodox Christian. For over 20 years, Mr.

4

Atwood's spiritual advisor has been Father Paisios, Abbot of the St. Anthony's Greek

5

Orthodox Monastery in Florence, Arizona. Father Paisios baptized Mr. Atwood into the

6

faith in July 2000 and has ministered to Mr. Atwood, in person, ever since.

7

Greek Orthodox Christianity requires (among many other things) that when the

8

State of Arizona attempts to execute Mr. Atwood, Father Paisios be allowed to deliver

9

10

last rites, including physical presence in the execution chamber and the Father placing his

11

hands on Mr. Atwood while speaking to him directly. In orthodoxy, these rites

12

specifically involve the priest placing his stole on the penitent's head and reciting certain

13

prayers, some of which involve response by the penitent—a practice already threatened

14

by the Department's execution protocol for lethal injection, which is likely to subject Mr.

15

16

Atwood to such excruciating pain that he will be deprived of lucidity and thus his ability

17

to engage in this experience. Mr. Atwood's religion requires that he be allowed to pray

18

with Father Paisios for a minimum of one hour on the day the state plans to take his life.

19

Defendants have consistently denied such religious access over the years and had

20

21

previously insisted to Mr. Atwood that they would not accommodate his sincerely-held

22

religious beliefs in this fashion. On April 7, 2022, the State filed for a warrant to execute

23

Mr. Atwood, which was granted on May 3, setting an execution date of June 8. Mr.

24

Atwood filed the present complaint just a week after the State sought the execution

25

warrant.

26

1    On April 15, 2022, , the Arizona Department of Corrections, Rehabilitation and

2 Rentry (the "Department") changed its position and claimed for the first time that it

3 would honor Mr. Atwood's known religious beliefs as it kills him, noting that it had been

4 planning this policy change since November 2021—although it failed to communicate

5 this reversal of policy to Mr. Atwood and had not made any changes to its execution

6 protocol in the intervening months. On April 21, 2022, defendants forwarded Plaintiff's

7 counsel a newly revised execution protocol, avowedly based on the Supreme Court's

8 decision in *Ramirez v. Collier*, 142 S. Ct. 1264 (2022). The protocol provides that "[t]he

9 inmate may designate one clergy/spiritual advisor to accompany the inmate into the lethal

10 injection execution chamber for audible prayer and religious touch, consistent with the

11 Supreme Court's Opinion in *Ramirez*." [Doc. 10-1] at 6. However, the policy also states

12 the Department "reserves the right to enforce as necessary any or all reasonable

13 restrictions on the audible prayer and religious touch." *Id.*

14

15    Defendants now seek to dismiss Mr. Atwood's complaint, just over a month

16 before they plan to kill him, solely on the basis that the Department has noncommittally

17 changed course and says it will for the first time respect Mr. Atwood's religious beliefs

18 and allow "audible prayer and religious touch" at the time of his death, subject to

19 unspecified restrictions bounded only by what the Department itself deems "reasonable."

20 But especially in light of Mr. Atwood's ongoing struggles to obtain well established,

21 constitutionally required religious accommodation while in the Department's custody, the

22 Department's noncommittal say-so is not enough. This Court should allow Mr. Atwood

1  to continue with this process to ensure his religious beliefs are protected during his

2  execution.

3

**ARGUMENT**

4

5  **I.      Mr. Atwood's Claims are Not Moot.**

6          The Department has never in its history allowed the religious procedures the

7  Supreme Court now requires as a matter of federal law; Mr. Atwood's execution will

8  almost certainly be the first time the Department will need to comply with that

9

10  obligation.[1] This Court cannot simply take the Department's word that it is aware of the

11  Supreme Court's decision and will abide by it. This is especially true where even the

12  Department's new (purportedly constitutionally compliant) policy reserves unspecified

13  restrictions on Mr. Atwood's religious exercise at the end of his life. This controversy

14  remains very much active, for two reasons: first, the new protocol the Department claims

15  fully discharges all its obligations is itself not sufficient to fully protect Mr. Atwood's

16

17  right to exercise his religion under RLUIPA, and second, even if the Department *had*, for

18  now, brought itself into compliance, its history of infringing on religious rights, even

19  where Department policy purported to protect them, means this Court can have no

20  confidence the Department will voluntarily do what it must.

21

22          A.  The Department's Proposed Accommodation Is Insufficient to Satisfy Mr.
              Atwood's Rights Under RLUIPA.

23

24          While Defendants claim their new protocol fully satisfies *Ramirez*, the new

25

26  [1] There is one execution scheduled prior to Mr. Atwood's, but as far as Mr. Atwood
    knows, that inmate, Clarence Dixon, has not requested religious accommodation.

protocol in fact guarantees very little, as it allows the Department to impose "any and all" restrictions it deems reasonable, while requiring the spiritual advisor to agree to take orders from correctional staff. *See, e.g.,* [Doc. 10-1] at 6, 40. That is a meaningless promise that does nothing but beg the question. The central matter in this litigation is what restrictions are reasonable in light of Mr. Atwood's religious needs and the Department's compelling interest, and that question cannot be answered by an assurance that only "reasonable" restrictions will be applied. At this stage, the limitations could be anything. They could infringe upon Mr. Atwood's sincerely held religious beliefs, or they could not. The trouble is, there is not enough specificity and no historical precedent for Mr. Atwood or this Court to assess the Department's position. If the Department is unwilling to articulate its restrictions, Mr. Atwood cannot know if they will substantially burden his exercise of religion.

Similarly, Defendants' contention that "the only restrictions imposed on the spiritual advisor are … recommended under *Ramirez*" is both a false recounting of *Ramirez* and wrong as to the language of the Department's new policy. [Doc. 10] at 6. First, the Supreme Court did not "recommend" restrictions on an incarcerated individual's religious exercise. Rather, the Court mused, in dicta, about hypothetical restrictions that *may* be able to pass muster as the least restrictive means of guarding a compelling government interest in the face of individual religious rights, in a particular case. *See Ramirez,* 142 S.Ct. at 1280-81. In doing so, the Court was careful to note that

each RLUIPA suit demands a careful "case-by-case analysis."[2] *Id.* at 1280.

Moreover, it is not true that the restrictions reserved by the Department's purported new policy are those mentioned by the Supreme Court in *Ramirez*. Defendants have staked their position in policy as allowing "any or all reasonable restrictions" [Doc. 10-1] at 6, and have not limited themselves to particular restrictions. Invoking *Ramirez* does not put meaningful limits on the Department's discretion, as *Ramirez* called for a case-by-case examination. To the extent *Ramirez did* indicate likely approval of certain restrictions, those restrictions were specific and bounded, not open-ended. *See Ramirez*, 142 S.Ct. at 1279-81. Thus, Mr. Ramirez, in consultation with his pastor, would have been able to determine whether the accommodations being offered were sufficient (had Texas not withdrawn its effort to put Mr. Ramirez to death).[3] Here, with the Department's non-committal commitment, Mr. Atwood, with Fr. Paisios, cannot do that. By the time it becomes clear exactly what the Department has in mind, it will be too late.

A protocol that leaves its content up to officials in the moment is, at bottom, arbitrary with respect to the spiritual advisor and the observer. If Mr. Atwood and Fr. Paisios do not know when he will and will not be permitted to speak, how can he ensure

---

[2] Mr. Ramirez, for instance, is a Baptist. His religion has its own particular requirements. As far as Mr. Atwood is aware, Mr. Ramirez's religion tradition does not involve, for example, the use of liturgical vestments the way orthodoxy does.

[3] In April, the Nueces County District Attorney moved to withdraw a death warrant for Mr. Ramirez, citing his "firm belief that the death penalty is unethical and should not be imposed on Mr. Ramirez or any other person." See, e.g., Ruth Graham, *Days After Setting an Execution Date, a Texas Prosecutor Reverses Course*, New York Times, Apr. 16, 2022.

that he completes the appropriate prayers at the appropriate times? How can he know

when he must start a given prayer to complete it before he could be cut off? The

agreement the Department proposes Fr. Paisios be required to sign specifies some times

when he would not be allowed to speak, but it does not guarantee him times when he

will. Agreeing that he may speak without any guidance as to when or for how long will

not accommodate Mr. Atwood's need to receive orthodoxy's specific last rites at the

appropriate time.

     In sum, the Department "ask[s] that [this Court] simply defer to their

determination. That is not enough under RLUIPA." *Ramirez*, 142 S.Ct. at 1279.


  B.  <u>The Department Cannot Meet Its Burden Under the Voluntary Cessation Doctrine.</u>

     "[A]s a general rule, 'voluntary cessation of allegedly illegal conduct does not

deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case

moot.'" *Cty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979). Under the 'voluntary cessation'

doctrine, "the mere cessation of illegal activity in response to pending litigation does not

moot a case, unless the party alleging mootness can show that the 'allegedly wrongful

behavior could not reasonably be expected to recur.'" *Rosemere Neighborhood Ass'n v.*

*United States EPA*, 581 F.3d 1169, 1173 (9th Cir. 2009) (citation omitted). "The party

asserting mootness bears a 'heavy burden' in meeting this standard." *Rosebrock v.*

*Mathis*, 745 F.3d 963, 971 (9th Cir. 2014). The principal danger to be avoided by this

analysis is to not dismiss a case as moot only to "leave [t]he defendant . . . free to return

to his old ways." *Id.* (quoting *Porter v. Bowen*, 496 F.3d 1009, 1017 (9th Cir. 2007)).

The Department's new protocol is, on its face, not "unequivocal in tone," and the

first consideration of the voluntary cessation analysis does not support Defendants in

meeting their stringent burden. *Rosebrock*, 745 F.3d at 971-72. This Court must hold the

Department to its constitutional obligations and do more than rubber stamp its assertion

that it will abide by the requirements of the *Ramirez* decision. Mr. Atwood's religious

beliefs are not an experiment to be left to the unwary and uncaring. Further, the

Department changed the protocol when Mr. Atwood asserted his legal rights. There is

nothing to stop it from changing it again, in whatever way it sees fit, with very little

notice.

Moreover, defendants' argument that "no other inmates have since been denied the

presence of a spiritual advisor in the execution chamber" [Doc. 10] at 7, is no comfort

given that the *Ramirez* decision is just over a month old and the Department has

conducted 35 lethal injection executions without, as far as Mr. Atwood is aware,

permitting spiritual advisors in the chamber, even though, ultimately, it is RLUIPA, since

its enactment in 2000, not *Ramirez,* that requires that. What's more, the State has a

history of denying Mr. Atwood the ability to receive sacraments, even though the law

was clear that it was necessary, and Mr. Atwood was forced to sue. Since then, he has

been forced to file multiple grievances not only to maintain his necessary visits, but also

for access to his religious property—even though he was indisputably entitled to these

accommodations. This history should make this Court more, not less, inquisitive about the Department's procedures.

Fundamentally, defendants have cited no voluntary cessation case that deals with the undeniably profound rights at issue here. It is of little moment whether a court has previously found mootness when government policies change in far-flung, unrelated contexts; defendants have not cited a case in which a court stopped short a condemned prisoner's suit seeking to protect their exercise of religious rights under constitutional and federal statutory law through their very last moments and ultimate execution. This Court should not do so here. In an ordinary case, the worst that can happen is that the defendant does indeed resume his illegal conduct, and the plaintiff is forced back to court. If the defendants engage in the feared illegal conduct here, Mr. Atwood will not be able to come back to this Court, because he will no longer be alive.

## CONCLUSION

This Court should deny defendants' motion to dismiss and require that the Department respect and allow Mr. Atwood's religious exercise during his last moments. The Department's vague and entirely caveated assertion that it will do so is simply not enough.

Dated this 5th day of May 2022

/s/     *Amy P. Knight*

Joseph J. Perkovich
Amy P. Knight
Attorneys for Frank Atwood

9