MGD

WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Jarvis Atwood,<br><br>              Plaintiff,<br><br>v.<br><br>Panann Days, et al.,<br><br>              Defendants. | No. CV 20-00623-PHX-JAT (JZB)<br><br>**ORDER** |

Plaintiff Frank Jarvis Atwood, who is currently confined by the Arizona Department of Corrections (ADC) in the Arizona State Prison Complex (ASPC)-Eyman, filed this civil rights action pursuant to 42 U.S.C. § 1983.[1] Before the Court is Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction regarding his medical care. (Doc. 109.) The Court held a hearing on the Motion on October 29, 2021 and permitted the Parties to file amended proposed findings of fact and conclusions of law.[2] The Court's findings of fact and conclusions of law based on the Parties' briefing and the hearing are set forth herein.

. . . .

---

[1] Plaintiff filed the original Complaint pro se but is now represented by counsel.

[2] Plaintiff and Defendants Centurion and Olmstead ("Centurion Defendants") had filed proposed Findings of Fact and Conclusions of Law prior to the hearing. (Docs. 147, 151.) After the hearing, only Plaintiff filed amended proposed Findings of Fact and Conclusions of Law as well as a proposed order (Doc. 166); Centurion Defendants filed an Objection to Plaintiff's Proposed Order (Doc. 171). Defendants Days, Shinn, Scott, Lopez, and Arnold ("ADC Defendants") did not file any proposed Findings of Fact and Conclusions of Law either before or after the hearing.

## I. Findings of Fact

Plaintiff has been incarcerated by ADC since 1987. (Doc. 147 ¶ 1.) Philip A. Davidson, MD, a board-certified orthopedic surgeon, has evaluated Plaintiff telephonically, reviewed Plaintiff's medical records related to his current condition, and testified at the hearing. Based on his review of Plaintiff's January 8, 2021 MRI of the lumber and cervical spine, Dr. Davidson concluded that Plaintiff has "severe cervical spondylosis with severe radicular symptoms to include, of great importance, C5-C6 myelomalacia. He has apparently overt radicular symptomatology as well as radiating pain, weakness, and motor dysfunction." (Doc. 109 at 28-29 ¶ 37.) Plaintiff's lumbar spine is his most painful condition, and "[his] neural symptomatology has contributed to the weakness that is limiting his ability to transfer and position, let alone ambulate. In addition, the neural compression and degenerative spondylosis are highly painful, most acutely when prone or in an erect seated posture." (*Id*. at 29 ¶ 38.)

Plaintiff's back pain began around 1990, and he has been treated over the past 30 years with oral medications. (*Id*. at 21 ¶ 14.). Plaintiff began using a wheelchair in 2015 and at that time he was classified an ADA (Americans with Disabilities Act) patient. (Doc. 167 (Hearing Tr.) at 117.) From 2011 to September 2020, Plaintiff was prescribed Tramadol, which effectively treated his pain. (Doc. 109 at 23 ¶ 20.) Plaintiff has tried numerous other medications, such as Cymbalta, for his pain, but they have either failed or Plaintiff had negative reactions to them. (Doc. 167 at 61, 121.)

In September 2020, Defendant Nurse Practitioner Olmstead discontinued Plaintiff's Tramadol prescription, and from October 2020 to the present, Plaintiff has been prescribed a lidocaine patch and Tylenol, which have provided "no appreciable pain relief." (Doc. 109 at 23 ¶ 20.) Olmstead asserts that "the medical decision has been made, after repeat examinations and other testing, that [Plaintiff] needs to be weaned off of narcotics, including Tramadol, due to poor tolerance/side effects and that had or have been, at times, a part of his prescription medication regimen, and that there is no medical indication to continue this medication." (Doc. 114-6 at 2 ¶ 4.) According to Olmstead, "[n]arcotics are

very powerful medications that should only be used in the appropriate case and for the shortest duration needed, which is how they have been used." (*Id.*) Olmstead testified that Centurion's medical director told her it was Centurion's policy "that long-term opioids are not prescribed unless a patient has cancer pain or they are in a hospice setting." (Doc. 167 at 169.) During the hearing, the Court asked Defendants to produce the policy. (*Id.* at 208-209.) Following the hearing, Defendants notified the Court that "no formal written policy exists," and they submitted the declaration of Dr. Rodney Stewart, Centurion's Site Medical Director for ASPC-Eyman. (Doc. 165 at 1.) Dr. Stewart states that he has implemented a policy "that patients are not to be prescribed opioids, such as tramadol, for an extended or indefinite period of time unless that patient is suffering from cancer-related illness or pain, terminal illness with pain, and other serious long-term disease implicating severe pain symptoms." (Doc. 165-1 at 1 ¶ 5.)

Plaintiff has not walked since 2017 and without Tramadol suffers "incomprehensible pain every time he need[s] to transfer to bed, chair or wheelchair." (Doc. 109 at 22-23 ¶¶ 17, 19.) Plaintiff can only sleep sporadically because he cannot lie flat and must sit in his wheelchair or partially recline in bed to minimize the severity of constant pain. (*Id.* at 24 ¶ 23.) Plaintiff's pain interferes with nearly all activities of daily living. (Doc. 167 at 27-28.) Without Tramadol, Plaintiff's pain is severe at 9 or 10 out of 10, his ability to transfer to and from his wheelchair is decreased, and his sleep is even more compromised. (Doc. 109 at 27 ¶ 34.) With Tramadol, Plaintiff's pain decreases to a 5 or 6, a moderate and manageable pain level. (Doc. 167 at 112, 121.)

Plaintiff has a recent history of falling, secondary to weakness in his legs, including falls in November 2020 and March 2021 when he was not taking Tramadol. (Doc. 109 at 24 ¶ 22.) Plaintiff testified he has fallen a half dozen times since 2016, and he attributes his falls to his medical condition and not Tramadol because the falls occur when he tries to move, and he feels a twinge of pain and weakness and collapses. (Doc. 167 at 115.) Dr. Davidson testified that Plaintiff's falls are not necessarily attributable to Tramadol, and the

falls indicate to him that Plaintiff needs more assistance with transfers and needs to be in a safer environment. (*Id*. at 49.)

In January 2021, Plaintiff suffered an extreme case of diarrhea, which was eventually diagnosed as a staph infection; the infection intensified Plaintiff's back pain and caused spasms, and he was unable to leave his bed or roll onto his side for nearly a week. (Doc. 109 at 25 ¶¶ 25-26.) To accept meals and medication, Plaintiff crawled or slid across his cell's urine-covered and feces-smeared floor. (*Id.* ¶ 25.) Plaintiff received injections of Toradol and a corticosteroid injection, which provided some pain relief for a couple of weeks. (Doc. 109 at 21 ¶ 15.)

Plaintiff received Tramadol when he was hospitalized in April 2021 and afterwards in the infirmary, but when he was moved back to the Browning Unit in June 2021, NP Olmstead reduced the dose of Tramadol to once daily with the intention of weaning Plaintiff off Tramadol completely. (Doc. 109 at 26 ¶¶ 28-33.)

On April 6, 2021, Olmstead submitted an urgent request for a neurosurgery consultation; Olmstead noted that she reviewed the case with Dr. Young, who asked that a consult be entered with a neurosurgeon to see if Plaintiff was a candidate for epidural injections. (Doc. 114-1 at 5-6.) On June 25, 2021, Plaintiff had an appointment with neurosurgeon Dr. Feiz-Erfan at Valleywise Health, but Dr. Feiz-Erfan first wanted an updated MRI and a follow-up appointment in 4 to 6 weeks. (Doc. 114-6 at 2 ¶ 7; Doc. 114-4 at 36-39.) On June 30, 2021, Olmstead submitted a routine consultation request for an MRI of the cervical spine and for a follow-up appointment with the neurosurgeon once the MRI is completed. (Doc. 114-16 at 2 ¶ 7; Doc. 114-5 at 11.) The MRI was authorized, and Plaintiff had the cervical MRI on July 16, 2021. (Doc. 114-5 at 11.; Doc. 130-1 at 2.)

Plaintiff next saw Dr. Feiz-Erfan on July 30, 2021, and Dr. Feiz-Erfan noted that Plaintiff's chief complaint was neck and back pain, but Plaintiff was also febrile and short of breath. (Doc. 132-1 at 15, 17.) Dr. Feiz-Erfan diagnosed Plaintiff with "status post anterior fusion, cervical 5-6, for myelopathy done by me on 12/11/2018. New Diagnosis is canal stenosis, lumbar 1-2; adjacent level disease, cervical spine." (*Id.*) Dr. Feiz-Erfan's

Plan of Care was "Epidural injection, lumbar 1-2. Physical therapy," follow up in 3 months, and to go to the nearest emergency room for acute symptoms, noting that Plaintiff "looks ashen and pale and appears sick acutely." (*Id.*) Under "Patient Instructions," the doctor wrote, "Patient to have injections and PT and follow up in 6 weeks.[3] (*Id.* at 19.) Olmstead noted in an August 2, 2021 medical record that Plaintiff was admitted to Valleywise Hospital on July 30 for urosepsis and had surgery for a new left stent placement and cystoscopy. (*Id.* at 37.) Dr. Davidson testified that in Plaintiff's case, spinal injections would provide only temporary or transient relief, and injections could diminish the need for Tramadol if repeated two to three times a year, but that it is likely they would only provide partial relief and Plaintiff may still need Tramadol in addition.[4] (Doc. 167 at 57.)

On August 2, 2021, Olmstead submitted a routine consultation request for epidural lumbar injections. (Doc. 132-1 at 37.) As of the date of the hearing, October 29, 2021, Plaintiff had not received his first epidural injection, but defense counsel asserted Plaintiff would have an injection in the next two weeks. (Doc. 167 at 199.) After seeing Dr. Feiz-Erfan, Plaintiff had four half-hour physical therapy sessions at the prison, but he testified that the physical therapy ended up causing more discomfort than any benefit. (*Id.* at 119.)

In October 2021, Plaintiff was again in the infirmary and while there, a doctor prescribed Tramadol for his pain on October 20, 2021, but Plaintiff did not receive Tramadol until the night before the October 29, 2021 hearing. (*Id.* at 109.) Plaintiff testified that a nurse told him he received Tramadol just before the hearing because "they wanted to be able to say [Plaintiff] was on the medication again." (*Id.* at 109-110.)

Dr. Davidson recommends without reservation that Plaintiff again be prescribed Tramadol given that trials of other medications have not worked and because other narcotics that might help his pain could be more addictive and habit forming. (*Id.* at 60-61.) Dr. Davidson stated a typical dose is 50 mg twice a daily, but the dose would have to

---

[3] It is not clear from the record if Dr. Feiz-Erfan was planning one epidural injection or a series of injections because he used the singular "injection" in the "Plan of Care" and plural "injections" in the "Patient Instructions."

[4] Dr. Feiz-Erfan did not testify.

be adjusted based on what Plaintiff has taken in the past and on the effectiveness of the spinal injections. (*Id*. at 58.) Dr. Davidson's professional opinion is that "it is imperative and humane that additional, palliative measures also be implemented on this patient's behalf immediately. These include lumbar and cervical orthosis, along with a residency setting where immediate hands-on wheelchair transferring assistance is continually available." (Doc. 109 at 30 ¶ 44.) Defendants' expert, Dr. Thomas Fowlkes, is board-certified in emergency medicine and is currently the medical director at a county detention facility in Oxford, Mississippi. (Doc. 167 at 64.) Dr. Fowlkes reviewed Plaintiff's medical records and agreed there was no evidence Plaintiff was addicted to Tramadol, that Plaintiff was diverting or abusing Tramadol, or that his cognition suffered because of Tramadol. (Doc. 167 at 80-85.)

**II.     Preliminary Injunction Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). "A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The movant "has the burden of proof on each element of the test." *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

Where a movant seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions,* 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879

(9th Cir. 2009)). "A mandatory injunction orders a responsible party to take action," while "a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals*, 571 F.3d at 879 (internal quotation marks omitted). "The 'status quo' refers to the legally relevant relationship between the parties before the controversy arose." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1060-61 (9th Cir. 2014).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

"The urgency of obtaining a preliminary injunction necessitates a prompt determination" and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial. *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). As a result, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In its determination on a motion for a preliminary injunction, "a court may properly consider evidence that would otherwise be inadmissible at trial." *Cherokee Inc. v. Wilson Sporting Goods Co.*, No. CV 15-04023 BRO (Ex), 2015 WL 3930041, at *3 (C.D. Cal. June 25, 2015); *see Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (district court did not abuse its discretion by considering "unverified client complaints" and the plaintiff's counsel's interested declaration when it granted a preliminary injunction); *Flynt Distrib. Co.*, 734 F.2d at 1394 (the district court has discretion to rely on hearsay statements when deciding whether to issue a preliminary injunction). A court may also consider evidence or developments that postdate the pleadings. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

When evaluating the merits of a preliminary injunction motion, a court's factual findings and legal conclusions are not binding at trial on the merits. *Univ. of Tex.*, 451 U.S. at 395.

### III. Conclusions of Law

Plaintiff seeks an order requiring Defendants to provide him (1) "the necessary pain medication to treat his constant severe pain," (2) "rehousing to a unit that has wheelchair transferring assistance available at all times," and (3) referral to an orthopedic surgeon "to evaluate Plaintiff for possible surgical intervention to treat and improve his spinal condition." (Doc. 109 at 15.) Based on the hearing and Dr. Davidson's recommendation, it is clear Plaintiff is seeking a resumption of his previous Tramadol prescription and the epidural injection(s) recommended by Dr. Feiz-Erfan. Because Plaintiff is not currently prescribed Tramadol and or received epidural injections as of the hearing date, he is seeking mandatory, rather than prohibitory, injunctive relief, with respect to his pain relief as well as his requests to be rehoused in a different unit with wheelchair transfer assistance available at all times and an evaluation by an orthopedic surgeon.

#### A. Pain Relief

##### 1. Likelihood of Success on the Merits

To establish a likelihood of success on the merits of an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The prisoner must show (1) that his condition constitutes a "serious medical need" and (2) that the defendant's current response to that need is deliberately indifferent. *Jett*, 439 F.3d at 1096; *see Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (where a plaintiff seeks injunctive relief, the deliberate indifference determination is based on the defendant's current conduct).

###### a) Serious Medical Need

Plaintiff has satisfied the objective prong of the deliberate indifference analysis. In the Court's January 12, 2021 Order on Plaintiff's previous request for injunctive relief, the

1 Court found no meaningful dispute that Plaintiff suffers from severe spinal pain, a serious
2 medical condition. (Doc. 87 at 9.) Moreover, Centurion Defendants do not dispute that
3 Plaintiff suffers from degenerative disc disease. (Doc. 114 at 3.) Indeed, Plaintiff's
4 condition causes him chronic and severe pain that medical personnel have found worthy of
5 attention and treatment. *See McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992),
6 *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir.
7 1997).

### b) Deliberate Indifference

With respect to the subjective prong, a plaintiff must first show that the defendant was "subjectively aware of the serious medical need[.]" *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017–18 (9th Cir. 2010) (quotation and citation omitted). A defendant's knowledge of a serious medical need or substantial risk to health "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," and a defendant may be found to have known of a substantial risk if the risk was obvious. *Farmer*, 511 U.S. at 842.

Here, there can be no dispute that Centurion Defendants are aware of Plaintiff's diagnosed condition and serious medical need because it is documented in his medical records showing decades of treatment for his spinal condition, including surgeries, medication trials, MRIs, and specialist appointments. Moreover, an orthopedic surgeon has recommended that Plaintiff have, at a minimum, palliative measures such as Tramadol and epidural injections, and a neurosurgeon has recommended epidural injection(s) and physical therapy.

After showing that a defendant was subjectively aware of the serious medical need, a plaintiff must show that the defendant "failed to adequately respond" to that need. *Simmons*, 609 F.3d at 1018. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted). Deliberate indifference may also be shown by the way in which

prison officials provide medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or "by a purposeful act or failure to respond to a prisoner's pain or possible medical need." *Jett*, 439 F.3d at 1096.

In the January 12, 2021 Order denying injunctive relief, the Court noted that Defendant Olmstead was taking steps to address Plaintiff's pain by means other than Tramadol, including seeking authorization for MRIs of Plaintiff's lumbar and cervical spine to assess whether there was further deterioration, which could support surgery or epidural spinal injections, and providing lidocaine pain patches. (Doc. 87 at 10.) However, at that time, the Court informed Defendants that a prolonged failure to address Plaintiff's severe pain through other means may warrant consideration of a new motion for injunctive relief. (*Id*. at 10-11.)

While Plaintiff had the lumbar and cervical spine MRIs on January 8, 2021, he did not see the neurosurgeon until June 25, 2021, which Centurion Defendants assert was the earliest appointment available to see the neurosurgeon. (Doc. 114 at 4 n.2). But Olmstead did not submit a consultation request for Plaintiff to see the neurosurgeon until April 6, 2021—three months after the MRIs were completed. There is no explanation for this three-month delay in attempting to obtain authorization for the neurosurgery consult. When Plaintiff saw the neurosurgeon in June 2021, the neurosurgeon wanted a new MRI, and when Plaintiff returned to the neurosurgeon on July 30, 2021, the neurosurgeon recommended epidural injections, physical therapy, and follow up in three months. Afterwards, Defendant Olmstead only submitted a routine consultation request for epidural lumbar injections, and as of the date of the hearing, October 29, 2021, Plaintiff had not had an epidural injection. Plaintiff has had physical therapy sessions at the prison, but they caused him more discomfort than benefit.

Centurion Defendants argue there is no evidence Plaintiff has been denied appropriate medical care and that he simply disagrees with the medical providers who have changed his pain medication from a narcotic to a non-narcotic. (Doc. 114 at 6.) They assert that "alternative means to treat Plaintiff's pain, including epidural steroid injections

and/or additional surgery, are currently being evaluated by the appropriate specialists."[5] (*Id*. at 4.)

Centurion Defendants have provided no explanation why Tramadol was appropriate for ten years and is suddenly inappropriate, requiring immediate cessation, or how the minimal pain relievers Plaintiff has received outside of the hospital or infirmary have been adequate to treat his significant pain issues. Defendant Olmstead makes the conclusory statement that "the medical decision has been made, after repeat examinations and other testing, that [Plaintiff] needs to be weaned off of narcotics, including Tramadol, due to poor tolerance/side effects . . . and that there is no medical indication to continue this medication." (Doc. 114-6 at 2.) Olmstead, though, does not say how Plaintiff manifested "poor tolerance/side effects" or point to any medical records showing poor tolerance/side effects to Tramadol. Nor does she explain why, if Plaintiff had poor tolerance/side effects to Tramadol which would contraindicate its use, he has been prescribed Tramadol while in the hospital and prison infirmary. Olmstead does say that Plaintiff "is still being prescribed some pain medication, including a topical aspercream [sic] lidocaine patch to place on his lower back for pain, due to the lower risk of drug interaction and side effects, especially with [Plaintiff's] advancing age the fact that he is a fall risk." (Doc. 114-6 at 2 ¶ 5.) But Olmstead does not address the history of falls Plaintiff has had since his regular Tramadol prescription was stopped in September 2020 or how Tramadol has increased the likelihood of falls by Plaintiff. Moreover, Dr. Davidson, who reviewed Plaintiff's medical records and evaluated Plaintiff by telephone, did not attribute the falls to Tramadol use and recommends that a "prescribed moderate dose of Tramadol should be sustained," noting Tramadol's "prior effectiveness and its lack of side-effects over the span of many years." (Doc. 109 at 29 ¶ 41.) Dr. Feiz-Erfan has recommended epidural injection(s), and, although Centurion Defendants indicated at the hearing that Plaintiff would have an

---

[5] Defendants made this argument before Plaintiff saw Dr. Feiz-Erfan for the second time on July 30, 2021.

- 11 -

injection around mid-November, it is unknown if Plaintiff will receive more than one injection or on a regular basis, as Dr. Davidson indicates may be necessary.

Centurion Defendants' post-hearing evidence of an unwritten policy that opiates only be prescribed for cancer patients with severe pain, terminal illness with pain, or other long-term disease implicating severe pain symptoms is unpersuasive, especially considering Plaintiff's past use of Tramadol for over ten years in the prison setting when Plaintiff was neither a cancer patient nor had a terminal illness. Specifically, the Court finds the policy unpersuasive because there was no evidence that it was based on a patient specific medical justification or a penological justification. Moreover, it appears Plaintiff's pain may fall under the unwritten policy's category of "long-term disease implicating severe pain symptoms."

Of particular concern to the Court is Centurion Defendants' delay of more than a year of treating Plaintiff's severe pain with something as effective as Tramadol. *See Hallet*, 296 F.3d at 744; *Jett*, 439 F.3d at 1096. Plaintiff's expert, who has interviewed and evaluated Plaintiff, recommended in June 2021 that Plaintiff be prescribed Tramadol on an ongoing basis, but Plaintiff has only received Tramadol when hospitalized or in the infirmary. Defendants finally sent Plaintiff to a specialist this summer, who recommended on July 30, 2021 that Plaintiff receive epidural injections and follow-up in three months, but Plaintiff had not received those injections as of October 29, 2021, and was not scheduled to receive an injection until sometime in November 2021, and there is no evidence that a follow-up appointment with Dr. Feiz-Erfan has been scheduled. The Ninth Circuit and other courts have routinely found that failure to follow a specialist's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable

jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (in granting a preliminary injunction for specialist treatment, the district court found that the prisoner plaintiff showed a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation). In addition, a failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at 105 & n.10 (the treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner does not have to prove that he was completely denied medical care).

Based on this record, Plaintiff has shown a likelihood of success on the merits of his deliberate indifference claim regarding the treatment of his pain. While up until the time of the hearing Plaintiff had received minimal treatment, the evidence shows that treatment is inadequate. And, the continual delays in providing adequate alternative pain management also support that Plaintiff will succeed on the merits of this claim. A reasonable jury could find that, in these circumstances, Centurion Defendants failed to competently treat Plaintiff's serious pain needs and acted with deliberate indifference.

### 2. **Irreparable Injury**

In addition to showing a likelihood of success, Plaintiff must demonstrate that absent an injunction, he will be exposed to irreparable harm. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th 1988) (speculative injury is not irreparable

injury sufficient for a preliminary injunction); *see Winter*, 555 U.S. at 22. To support a mandatory preliminary injunction for specific medical treatment, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury. *See Conn. v. Mass.*, 282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or presently threatened injuries"); *Caribbean Marine*, 844 F.2d at 674. "[T]here must be a presently existing threat of harm, although injury need not be certain to occur." *Villaneuva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal. Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–80 (9th Cir. 1997)). Pain can constitute irreparable harm. *See Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed and/or complete lack of necessary treatment, and increased pain); *McNearney*, 2012 WL 3545267, at *14 (finding a likelihood of irreparable injury where the plaintiff's medical condition predated her incarceration and had not worsened, but the evidence showed that she continued to suffer unnecessary pain due to the defendants' inadequate treatment plan); *Von Collin v. Cnty. of Ventura*, 189 F.R.D. 583, 598 (C.D. Cal. 1989) ("Defendants do not argue that pain and suffering is not irreparable harm, nor could they").

Prior to his kidney issues earlier this year, Plaintiff reported to Dr. Davidson that his pain was constant at 8 out of 10, he suffers "incomprehensible pain" when he transfers to and from the wheelchair, a history of falls, that the pain is only somewhat lessened by remaining in a seated position, that he cannot lie down at all, and he only sleeps sporadically. After Plaintiff's treatment for kidney issues, his pain is now at 9 out of 10, his ability to transfer has decreased even more, and his sleep is even more compromised.

Plaintiff's ongoing severe pain and associated issues are sufficient to support a finding of irreparable harm. *See Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose" ); *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action).

   **3.**  **Balance of Hardships**

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotation omitted). The Ninth Circuit has held that the interest in protecting individuals from physical harm outweighs a government entity's monetary costs. *See Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) ("faced with [ ] a conflict between financial concerns and preventable human suffering, [the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiff's favor") (quotation omitted).

Centurion Defendants argue that "restructuring the procedures and policies for one single inmate could result in security and safety breaches, inmate unrest and staffing issues, particularly where the relief sought is not necessary or is already being processed." (Doc. 114 at 9-10.) They further argue that the relief requested would trigger federalism concerns and cause the Court to needlessly interfere with the prison's operations.

The Court is unconvinced by Centurion Defendants' general argument, without any citation to any procedures or policies, that "restructuring the procedures and policies for one single inmate could result in security and safety breaches [and] inmate unrest and staffing issues." The Court is also unconvinced that granting Plaintiff pain relief would result in needless interference in the prison's operations.

As articulated above, Plaintiff is likely to suffer irreparable injury absent an injunction; thus, his injury is more than just speculative. Furthermore, Centurion Defendants have made no showing that they will face any harm if an injunction issues. The Court finds that the balance of hardships tips sharply in Plaintiff's favor.

### 4. Public Interest

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation omitted). Moreover, "the public has a strong interest in the provision of constitutionally-adequate health care to prisoners." *McNearney*, 2012 WL 3545267, at *16 (quoting *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009)); *see Farnam v. Walker*, 593 F. Supp.

2d 1000, 1017 (C.D. Ill. 2009) (holding that public had an interest in the maintenance of prisoner's health during the pendency of the lawsuit).

Centurion Defendants argue that granting injunctive relief "would not be in the public interest because it would require this Court to override the decisions of correctional authorities and medical providers, who are responsible for the safety, security, care and efficient operation of the prison, as well as for the healthcare of Plaintiff." (Doc. 114 at 10.) They further contend that "the public welfare militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights." (*Id.*)

Contrary to Centurion Defendants' assertions, the record supports Plaintiff's claims that he is suffering significant pain, sleeplessness, and related issues and is being denied constitutionally adequate medical care for his pain. The Court finds that it is in the public interest to prevent Plaintiff from suffering ongoing pain and other complications during the remainder of this lawsuit. Accordingly, this factor favors injunctive relief that requires Centurion Defendants to provide the epidural injection(s) recommended by Dr. Feiz-Erfan and to re-start Plaintiff's prescription for Tramadol, unless a specialist recommends an alternative pain medication.

### 5. Narrowly Tailored Relief

As stated, the PLRA requires any injunctive relief to be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2). Centurion Defendants do not address this factor.

As noted, Plaintiff wants his prescription for Tramadol re-started, as recommended by Dr. Davidson, and the epidural injection(s) recommended by Dr. Feiz-Erfan. Adhering to the specialists' recommendations is the most narrowly drawn relief necessary to correct the harm identified by Plaintiff. Thus, Plaintiff's request for relief satisfies the requirements of the PLRA.

### 6. Bond Requirement

Rule 65(c) of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Despite this mandatory language, "Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation omitted). The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct. *Id.*

Here, Centurion Defendants have not requested a bond or submitted any evidence regarding likely damages. Accordingly, the Court will waive the bond requirement.

Having met all requirements for injunctive relief, the Court will require Centurion Defendants to provide Plaintiff with the epidural injection(s) and to re-start Plaintiff's prescription for Tramadol, unless a specialist recommends an alternative pain medication.

**B.   Housing**

As to Plaintiff's request for different housing, ADC Defendants argue that this relief is wholly unrelated to the remaining claims in this lawsuit and therefore inappropriate. (Doc. 118 at 5.) In his First Amended Complaint, Plaintiff alleged that on July 12, 2019, Defendant Days moved Plaintiff from the death-row wheelchair pod to the death-row security threat group pod and housed Plaintiff in a cell without handicap bars, causing Plaintiff to fall repeatedly while transferring to and from his wheelchair to his bunk and toilet. (Doc. 36 at 5, 14.) ADC Defendants point out that the prison has now installed grab bars in Plaintiff's cell and the specific areas of the prison he requested. (Doc. 118 at 5, citing Doc. 61; *see also* Doc. 37 at 28 (denying as moot Plaintiff's request for grab bars in his cell and shower).) Plaintiff does not address ADC Defendants' argument that his request for a transfer to a different unit is unrelated to his existing claims or requested relief.

"[T]here must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation*

*Oncology, LLC v. Queen's Med. Center*, 810 F.3d 631, 636 (9th Cir. 2015); *see Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (affirming denial of a preliminary injunction request based on alleged retaliatory conduct unrelated to the basis of a prisoner's § 1983 claim). Plaintiff's requested relief for a transfer is unrelated to his claim about the lack of handicap bars in his cell and certain areas of the prison, which have been resolved, and there is no existing claim regarding 24-hour transfer assistance or that Plaintiff has requested and been denied such assistance. Accordingly, the Court will deny this request for relief.

### C. Surgical Evaluation

Plaintiff filed his Motion on June 22, 2021, seeking "an immediate evaluation by an orthopedic specialist to determine available surgical options that could treat and improve his condition." (Doc. 109 at 2.) Plaintiff's expert, Dr. Davidson, recommended an evaluation by either an orthopedic spine surgeon or neurosurgeon to determine his surgical options. In his Reply, Plaintiff states that he "asked this Court to order an evaluation with a neurosurgeon, and although he "was evaluated by such a specialist in late June, nothing has yet come of that evaluation and consult." (Doc. 125 at 5 n.2.) After he filed his Reply on July 19, 2021, Plaintiff saw Dr. Feiz-Erfan a second time—on July 30, 2021—and Dr. Feiz-Erfan recommended epidural injection(s) to relieve Plaintiff's pain. Dr. Feiz-Erfan did not include any recommendations or comments regarding surgical options in his report.

Because Plaintiff has now been evaluated by a neurosurgeon, and the Court has already ordered compliance with Dr. Feiz-Efran's recommendations for epidural injection(s), this request for injunctive relief is moot.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 109).

(2) Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 109) is **granted in part** as follows:

  (a) Within **ten (10) days** of the date of this Order, Centurion Defendants must re-start Plaintiff's prior prescription for Tramadol, unless a <u>specialist</u> has recommended an equally effective alternative pain medication.

  (b) Within **ten (10) days** of the date of this Order, Centurion Defendants must schedule the epidural injection(s) recommended by Dr. Feiz-Erfan unless the injection(s) have already occurred.

  (c) Centurion Defendants must file a Notice with the Court within 20 days of the date of this Order, that Plaintiff has been re-started on Tramadol, or on an equally effective alternative pain medication recommended by a specialist, has received at least one epidural injection, and when any future injections are scheduled.[6]

  (d) This relief is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct the harm. *See* 18 U.S.C. § 3626(a)(2).

  (e) Plaintiff is not required to post bond.

(3) The Motion is otherwise **denied**.

Dated this 7th day of December, 2021.

James A. Teilborg
Senior United States District Judge

---

[6] The Court recognizes that for security reasons, it may not be appropriate for Defendants to divulge the exact dates and times of the scheduled appointments for injections. But Defendants' Notice must include the week(s) in which the injection(s) are scheduled. Defendants may redact the day—but not the month or year—of the appointments or may seek to file the dates under seal for ex parte review.

- 19 -