# EXHIBIT 2

SVK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Jarvis Atwood, | No. CV 13-0174-PHX-JAT (LOA) |
| Plaintiff, | |
| vs. | **ORDER** |
| Michael Linderman, et al., | |
| Defendants. | |

Plaintiff Frank Jarvis Atwood, a Greek Orthodox inmate in custody in the Special Management Unit II (SMU II, Browning Unit), filed this civil rights case against Arizona Department of Corrections (ADC) employees Michael Linderman, Pastoral Activities Administrator, and Charles Ryan, Director, alleging denial of Plaintiff's exercise of religious rights by reducing the number and length of visits he can receive from his Greek Orthodox priest. (Doc. 1.)

Plaintiff's Motion for a Preliminary Injunction regarding visits by his Greek Orthodox priest to conduct weekly two-hour religious services is now before the Court.[1] (Doc. 5.) Plaintiff subsequently filed a Motion for a Default Ruling. (Doc. 14.) He has also needlessly complicated the record here by filing a second Motion for a Preliminary Injunction, with supplements and errata seeking the same relief, and without waiting for

---

[1] Plaintiff has also submitted a Motion for Protective Order (Doc. 16) seeking other relief, which will be addressed by separate order.

the Court to rule on the first motion.[2]  (Docs. 22, 23, 25, 26, 28.)  Defendants oppose the motions.  (Docs. 20, 27.)

The Court will grant the motion to the extent that the Court will direct Defendants to allow Plaintiff the opportunity to receive pastoral visits from a Greek Orthodox pastor two times per month for up to two hours.  The Court will deny the request for weekly visits.

**I.     Background**

In his Complaint, Plaintiff alleges that ADC had for twelve years permitted two-hour weekly visits to the Browning Unit by a Greek Orthodox priest to conduct religious services for Plaintiff.  (Doc. 1.)  In 2012, Defendants reduced the visits to once per month.  Plaintiff asserts that this violates his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), the First Amendment, and the Equal Protection Clause.  (*Id.*)

In addition to filing his Complaint, Plaintiff moved for a Preliminary Injunction directing Defendants to restore the two-hour weekly visits to so he can "engage in essential sacramental religious services."  (Doc. 5.)[3]  In its screening Order entered March 3, 2013, this Court directed Defendants to answer the Complaint; it also directed Defendants to respond to Plaintiff's Motion for a Preliminary Injunction.  Defendants failed to respond to the motion, and the Court issued an Order to Show Cause.  (Doc. 18.)  Defendants responded and oppose the request for a preliminary injunction.[4]

///

///

---

[2] The Local Rules of Civil Procedure permit a motion, a response, and a reply. LRCiv 7.2.  Plaintiff is not permitted to provide his evidence and argument serially. Plaintiff has unnecessarily delayed resolution of these motions, and the Court will not permit successive filings in the future.

[3] Plaintiff also filed a Motion for Default Ruling (Doc. 14) on the Motion for Preliminary Injunction.  The Court will deny the request.

[4] Defendants have discharged their obligation regarding the Order to Show Cause.

- 2 -

## II. Legal Standards

### A. Preliminary Injunction

A preliminary injunction is an extraordinary and drastic remedy and "one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, pp. 129-130 (2d ed. 1995)). An injunction may be granted only where the movant shows that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The movant has the burden of proof on each element of the test. *Environmental Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000). A Request for a TRO is governed by the same general standards that govern the issuance of a preliminary injunction. *See New Motor Vehicle Bd. v. Orrin W. Fox. Co.*, 434 U.S. 1345, 1347 n. 2 (1977); *Los Angeles Unified Sch. Dist. v. U.S. Dist. Court*, 650 F.2d 1004, 1008 (9th Cir. 1982).

In addition, because the function of a preliminary injunction is to preserve the status quo pending a determination on the merits, *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988), there is heightened scrutiny where the movant seeks to alter rather than maintain the status quo. *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (holding that mandatory, as opposed to prohibitory, injunctions are "subject to a heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party").

Under the "serious questions" version of the sliding-scale test, a preliminary injunction is appropriate when a plaintiff demonstrates that "serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1134-35 (9th Cir. 2011), citing

*Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc). This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another. "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

The Prison Litigation Reform Act (PLRA) also imposes requirements on prisoner litigants who seek preliminary injunctive relief against prison officials. "Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Thus, § 3626(a)(2) limits the court's power to grant preliminary injunctive relief to inmates; "no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

### B. RLUIPA[5]

RLUIPA prohibits the government from imposing a substantial burden on the religious exercise of an institutionalized person unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1) - (2). Therefore, to state a claim under RLUIPA, a plaintiff must allege facts to support that government action has substantially burdened the exercise of the plaintiff's religion without a compelling government interest and by the least restrictive means. *See Guam v. Gurerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002). "[A] 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th

---

[5] Because the standard under RLUIPA is higher for Defendants to meet, the Court will analyze the Preliminary Injunction Motion under RLUIPA and not the First Amendment.

- 4 -

Cir. 2005) (quotations omitted). Thus, an institutionalized person's religious exercise is substantially burdened "'where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his belief.'" *Id.*

Under RLUIPA, a government may not impose a substantial burden on the religious exercise of a confined person unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). This "compelling government interest" and "least restrictive means" test replaced the "legitimate penological interest" test of *Turner v. Safley*, 482 U.S. 78, 89 (1987), which is applicable in First Amendment cases. *Warsoldier*, 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-1(a)). Under its own terms, RLUIPA must be "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." *Id.* at 995.

The inmate bears the burden of establishing prima facie that RLUIPA has been violated and that his religious exercise has been substantially burdened. *Id.* at 994. The government then bears the burden of proving that the substantial burden on the inmate's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. *Id.* at 995.

### III. Arguments and Analysis

#### A. Arguments

##### 1. Plaintiff

Plaintiff argues that he meets the elements for a preliminary injunction.

As to irreparable harm, he asserts that he has endured a substantial burden on his religious practice because he has been deprived of the opportunity to exercise the requirements of his faith, mandatory weekly confession and communion, and that the continuing deprivation of a constitutional right is irreparable harm. (Doc. 7 at 3- 4, *citing Am. Trucking Assoc.*, 559 F.3d at 1058-59.)

- 5 -

1  Plaintiff asserts that he is a death-row inmate preparing for his execution by
2  pursuit of the Lord Jesus Christ, which involves weekly Holy Sacraments. (*Id.* 7 at 4.)
3  He argues that Defendants will suffer no harm and have permitted the weekly visits for
4  12 years, so the balance of hardships favors him. (*Id.* at 4-5.)

5  As to success on the merits, Plaintiff asserts that the failure to permit inmates'
6  exercise of their religion has been repeatedly proscribed by the courts. (Doc. 7 at 5.)

7  Finally, Plaintiff argues that it is always in the public interest for government
8  officials to comply with the Constitution. (Doc. 7 at 6.)

9  Plaintiff's second Motion for a Preliminary Injunction essentially repeats the
10 arguments of the first motion. (Doc. 22.) Plaintiff claims that at the time of the second
11 motion, he had not received any response by Defendants to the Order to Show Cause.
12 (*Id.* at 1.) As an exhibit, he provides an e-mail correspondence between Father Paisios
13 and Linderman in which Paisios states that one hour per week is not enough time to fulfill
14 Plaintiff's spiritual and sacramental needs. (*Id.*, Ex. B.) Linderman responds that that is
15 a matter for Plaintiff to pursue but that Linderman would be interested in receiving a
16 copy of who Paisios spoke to when he arranged visits. (*Id.*)

### 2. Defendants

18 In support of their opposition, Defendants submit the declaration of Defendant
19 Linderman. (Doc. 19, Linderman Decl.) Defendants argue that there are 35,000 ADC
20 inmates who have a declared religious preference and that all inmates must be afforded
21 the same religious visitation opportunities. (Linderman Decl. ¶ 9.) ADC policy and
22 practice allows all inmates one religious visit per month for one hour. (*Id.* ¶ 7.) The
23 policy allows religious visits while maintaining ADC's interest in keeping order and not
24 overwhelming the chaplaincy and/or visitation personnel. (*Id.* ¶ 8.)

25 Defendants assert that Plaintiff was inadvertently granted additional religious
26 visits that were not approved by Linderman's office (ADC Chaplaincy); they were
27 coordinated directly with the visitation office by Plaintiff's Greek Orthodox religious
28 visitor. (*Id.* ¶ 10.) The Pastoral Visitation Report shows that he had more than one

religious visit per month as early as October 2002, and those visits have regularly exceeded longer than one hour. (*Id.* ¶ 11.) Defendants contend that at no point did Plaintiff have weekly religious visits. (*Id.* ¶ 12.)

Defendants assert that starting in 2000, the Senior Chaplain at Arizona State Prison Complex-Eyman (ASPC-Eyman) arranged for a pastoral visit to Plaintiff in accordance with ADC's procedure of one visit of one hour duration per month. (*Id.* ¶ 13.) ADC records reflect that Fr. Papioannoy first visited Plaintiff on April 7, 2000. (*Id.* ¶ 14.) A visitation officer listed Fr. Papioannoy on Plaintiff's visitation list (a practice now prohibited in policy) as a pastoral visitor ("P"), monitored the visit, and allowed it to last 1.5 hours. (*Id.* ¶ 15.)

According the Defendants, at some point, the pastoral visitor began making direct contact with the visitation officer and visited with the visitation office's approval. (*Id.* ¶ 16.) When the Browning Unit Deputy Warden discovered that visitation officers were allowing this practice, he stopped it. (*Id.* ¶ 17.) Defendants assert that Fr. Papioannoy subsequently contacted Linderman and admitted that a visitation officer was allowing the extra and longer visits, but claimed that chaplains had previously arranged the visits. (*Id.* ¶ 18.) Defendants claim that Fr. Papioannoy refused to provide Linderman any verification that he had been going through the chaplain for the visits or the identity of the chaplain who had allegedly previously arranged the visits. (*Id.* ¶ 19.)

Linderman attests that he personally briefed Ryan on this issue when it was discovered and stopped. (*Id.* ¶ 20.) Ryan indicated he approved of discontinuing the practice and asked for a report on its inception. (*Id.* ¶ 21.) Linderman then reported to Ryan about the visitation officer's unauthorized practices, circumventing the chaplaincy. (*Id.* ¶ 22.)

Defendants argue that to allow Plaintiff the frequent and/or lengthy visits he has inadvertently received would create equal-protection problems for the remainder of the 35,000 inmates in ADC custody who have declared a religious preference. (*Id.* ¶ 24.) In addition to security concerns related to frequent and lengthy religious visits (one staff

- 7 -

1    member must be present per religious visitor), the chaplaincy would be overwhelmed
2    with religious-visitor applications as well as monitoring and scheduling responsibilities
3    associated with ADC-wide religious visitors. (*Id.* ¶ 25.) At ASPC-Eyman there are
4    currently three full-time chaplains for 5,000 inmates. (*Id.* ¶ 26.) Of the 5,000 inmates at
5    ASPC-Eyman, there are 124 inmates on death row, according to the ADC's website. (*Id.*
6    ¶ 27.) ADC would be legally required to offer equal opportunities to all death row
7    inmates across the various ASPC facilities and to the 35,000 declared-religious inmate
8    population. (*Id.* ¶ 28.) According to Defendant, allowing weekly pastoral visits to all
9    ADC inmates with declared religious preferences would require substantially greater
10   personnel in the chaplaincy and Linderman's office to staff, monitor, process
11   applications, and otherwise oversee such visits. (*Id.* ¶ 29.) Linderman asserts that
12   although it is difficult to estimate how great that burden would be, it would be substantial
13   and likely require several additional full-time chaplains per each of the ADC's 10 public
14   facilities. (*Id.*)

15   Defendants also assert that if Plaintiff wants to see Fr. Papioannoy more than once
16   per month, he can be placed on Plaintiff's visitation list as a regular visitor and avail
17   himself of the three weekly regular visitation opportunities. (*Id.* ¶ 23.)

18   Defendants argue that Plaintiff has not shown a likelihood of success on the merits
19   because he never received weekly pastoral visits and the extra visits he did receive were
20   not authorized by the ADC chaplaincy, as required of all pastoral visits. (Doc. 19 at 5.)
21   The policy of monthly visits advances legitimate state interests of maintaining security
22   and order and reasonable burdens on chaplains and correctional staff. (*Id.* at 6.)
23   Defendants also assert that Plaintiff cannot show a real threat of irreparable harm because
24   he mischaracterizes the nature and frequency of the visits he received. (*Id.*).

25   Defendants also respond to Plaintiff's second Motion for a Preliminary Injunction,
26   arguing that it is incorrectly premised on Defendants' alleged failure to respond to the
27   Order to Show Cause. (Doc. 27.)

28   ///

### 3. Reply

Plaintiff replies that the gist of Defendants' argument is that maximum-custody inmates get pastoral visits for 1 hour monthly and no religious services. (Doc. 23 at 2.)[6] Plaintiff claims Department Order (DO) 904, provides that there is a minimum 90-minute weekly religious service. (*Id.*) He asserts that Defendants' claim that 2-hour weekly visits would burden staff claim is unsupported and that he had 12 years of at least bi-weekly visits during which there was no burden on personnel. (*Id.*)

Plaintiff disputes Defendants records and claims that his own records show weekly visits for several periods of time. (*Id.* at 3.) Plaintiff presents evidence---a statement from Fr. Paisios (aka Nicholas Papaioannou), dated May 15, 2013---that for 12 years, Fr. Paisios visited Plaintiff for up to 2 hours weekly. Paisios states that he scheduled his visits through the chaplains, contrary to Linderman's assertions, and that the visits were generally scheduled in 3 to 6 month blocks. (*Id.*)

Plaintiff claims that he and Father Paisios consulted with "the chaplaincy and visitation" regarding whether Fr. Paisios could provide Holy Communion if he was on the regular visitation list or if he could be on both lists and "these options were answered in the negative." (*Id.* at 4.)

In his second supplement, Plaintiff provides copies of e-mail correspondence between what appears to be an ADC facility Chaplains' office and Father Paisios and between what appears to an ADC facility Chaplains' office and the Browning Visitation Unit. (Doc. 25, Ex. A.) The December 13, 2010 e-mail regarding visits on January 13 and 27, February 3 and 17, and March 3 and 17, states that visits will be at the usual time "beginning at 0900-1100 hrs." (*Id.*) It is from Mary Hericks, who signs as "Secretary, ASPC-Eyman Religion," and it is cc'd to James Vicklund and Allen Miser. A March 21, 2011 e-mail form Mary Hericks to Fr. Paisios, states that per Browning Visitation, certain dates are not available. The June 1, 2011 e-mail from Fr. Paisiso is to Allen Miser,

---

[6] The Court will treat the supplements and additional filings as the reply.

- 9 -

whom Paisios addresses as Chaplain, and it requests visits for July 7 and 21, August 11 and 25, and September 1, 15, and 29. The June 2 attached e-mail is from Miser to Stacy Chambers and others asking if the dates are available. (*Id.*) The September 8, 2011 e-mail is from Miser to Stacy Chambers asking for visit appointments for October 13 and 27, November 3 and 17, and December 1, 15, and 29 and noting that the time for all dates is "0900-1100." (*Id.*) The response from Chambers to Miser shows that one day could not be scheduled and is signed, CO II S. Chambers, Browning Visitation Unit. (*Id.*) On September 8, Miser notified Paisos by e-mail, that he had been approved for all but one requested date. (*Id.*)

Plaintiff submits a Notice of Errata. (Doc. 26.) It includes what appears to be Deputy Warden Higginson's September 14, 2012 response to an Inmate Grievance. (*Id.*, Ex. A.) In it, the Deputy Warden states that the grievance has been resolved because Senior Chaplain Vicklund agreed to permit weekly visits of one hour by Fr. Paisios. (*Id.*) With his supplement to the Notice of Errata, Plaintiff submits an August 15, 2013 e-mail from Chaplain Childs to James Vicklund stating that Paisios wants two hour visits every two weeks for the next six months and they have now been set for one-hour visits every two weeks for the next six months, and noting that it may be possible to do a few minutes for the Eucharist but there is no guarantee for an hour long confessional in the restricted visitation area.[7] (Doc. 28, Ex. B.) There is also a September 20, 2012 response from Linderman to Plaintiff's grievance stating that for the past 20 years, pastoral visits have always been for one hour and that ADC does not have the resources for more frequent or longer visits. (*Id.*, Ex. C.) Plaintiff also includes his own records of religious visitation.[8]

///

///

---

[7] The result here would be the same even if the Court did not consider Docs. 28 and 29, which were filed after Defendants' response to Plaintiff's second Motion for a Preliminary Injunction.

[8] Finally, Plaintiff files a reply, acknowledging that he has made a "somewhat . . . confusing mess" of the preliminary injunction litigation. (Doc. 29.)

- 10 -

## B. Analysis

The Court will grant the motion to the extent that the Court will direct Defendants to allow Plaintiff to receive pastoral visits two times per month for up to two hours per visit so that there is the opportunity to receive confession and communion. The Court will deny the request for weekly visits. The Court finds that on the record before it, Defendants have not met their burden to show that the ADC visitation policy is the least restrictive means to satisfy their compelling government interests.

### 1. Likelihood of Success on the Merits

As noted, the inmate bears the burden of establishing prima facie that RLUIPA has been violated and that his religious exercise has been substantially burdened; if he meets that burden, the burden then shifts to the government to prove that the substantial burden on the inmate's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. *Warsoldier*, 418 F.3d at 994, 995. In *Warsoldier*, the Ninth Circuit reversed the denial of a preliminary injunction to an inmate who brought a RLUIPA challenge to the California Department of Corrections' (CDC) grooming policy that limited hair length to three inches. *Id.* at 1002.

The initial step in the analysis under RLUIPA requires Plaintiff to show that the religious practice at issue—weekly two-hour religious services—satisfies two criteria: (1) the proffered belief must be sincerely held and (2) the claim must be rooted in religious belief and not purely secular philosophical concerns. *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). The right to religious practice "is not limited to beliefs which are shared by all of the members of a religious sect." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 715-16 (1981). In other words, Plaintiff is not required to show that weekly two-hour services are mandated as a central tenet of his religion; rather, he is required to show that he sincerely believes that weekly services are consistent with his faith. *Shakur v, Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

- 11 -

Defendants do not dispute that Plaintiff's sincerely held religious beliefs require weekly two-hour Greek Orthodox religious services that include confession and Holy Communion. Plaintiff asserts that these are required by his faith.

The Court finds, however, that Plaintiff has failed to establish that he has in the past received *weekly* two-hour religious services. In their response, Defendants confusingly state that Plaintiff "has never enjoyed weekly pastoral visits, and the bi-weekly monthly visits that [Plaintiff] enjoyed were not authorized by the ADC chaplaincy. . . ." (Doc. 19 at 5.) Linderman attests that Plaintiff never received weekly visits "but enjoyed more than one religious visit per month as early as October 2002. (*Id.*, Linderman Decl. ¶¶ 11-12.) Defendants attach a chart purporting to show the pastoral visits Plaintiff received. The chart shows 17 visits for 2011, which appears to be the last full year before the additional visits were stopped. Plaintiff asserts that he received weekly visits. Thus, there is a dispute of fact regarding how frequently Plaintiff received pastoral visits in the past, but Defendants acknowledge that it was more frequently than once per month and some of the correspondence between Paisios and ADC shows that it was approximately every two weeks. It is undisputed that Defendants have reduced the visits to one per month. In addition, there is evidence that Plaintiff's prior visits were two hours long.

The Court finds that reducing the religious services from approximately twice-monthly to monthly and reducing the time from two hours to one hour constitutes a substantial burden to Plaintiff's religious practice. The burden now shifts to the government to demonstrate a compelling interest for the policy and that the policy is the least restrictive means to further the interest.

Defendants advance several reasons for reducing number of Plaintiff's religious visits to one per month. First, they claim that it is ADC policy to restrict religious visits to one per month for one hour. But they cite to no authority and point to no language in DO 904, *Inmate Religious Activities*, to support that claim. Plaintiff asserts that the

- 12 -

policy permits one religious service per week and that the duration is 90 minutes. Section 904.03 governs "religious activities." It states:

> 1.5 Number/Length of Religious Activities or Services
>
> 1.5.1 The Senior Chaplain/Chaplain, in conjunction with Wardens, shall determine the number of formal religious activities per unit per week following an assessment of the religious needs of the institution/unit. . . .
>
> 1.5.3 Services assisted with or conducted by volunteers shall be scheduled for a minimum of 90 minutes, unless a shorter duration is requested by volunteers.

Section 904.05 governs "religious visitation" and provides that Wardens and Deputy Wardens shall encourage religious visitation between religious leaders and inmates. It further provides that as to visits by religious leaders:

> 1.1.1 Senior chaplains/Chaplains shall arrange all religious and pastoral visits. Authorization for religious visits may be at the discretion of the Warden or Deputy Warden.
>
> 1.1.2 Wardens or Deputy Wardens may deny religious visits which may threaten the safety and/or security of the institution.
>
> 1.1.3 Inmates shall request or consent to visits by accredited ministers or religious leaders prior to visit authorization.
>
> 1.1.4 Senior Chaplains/Chaplains shall verify the credentials and/or accreditation of the visiting religious leader(s).
>
>     1.4.1.1 Wardens, Deputy Wardens or Senior Chaplains/Chaplains shall consult with the Pastoral Activities Administrator when there is a question regarding the validity of visiting religious leaders' credentials.
>
> 1.1.5 After their credentials have been verified, Senior Chaplains/Chaplains shall facilitate pastoral visits including distributing appropriate gate passes.
>
> 1.1.6 Pastoral visitors shall not be placed on inmates' visitation list.

The parties have somewhat confused the issue here because they have used the terms religious service and religious visit interchangeably. It is not clear if Defendants are claiming that under the ADC policy, inmates are limited to a total of one religious service or pastoral visit per month---that is, inmates must choose between a service and a visit, or if religious services are even limited to one per month. There is no suggestion in Plaintiff's evidence that the religious activities he attended involved more than one inmate, but he states that he received confession and communion, and Defendants do not dispute this. It is not clear if Defendants consider this a "religious activity or service" under DO 904.03 or a "religious visitation" under 904.05. They do not allege that Plaintiff attends religious services in addition to the pastoral visits. In either the case of services or visits, the written policy does not support Defendants' claim that inmates are limited to one such activity per month. And it appears that as recently as September 2012---only a few months before the Complaint was filed with this Court---the Senior Chaplain told the Deputy Warden that he had agreed to weekly visits for Plaintiff. (Doc. 26, Ex. A.) In addition, the e-mail correspondence appears to support Plaintiff's claim that the Chaplain's office permitted visits every other week. (Doc. 25, Ex. A.) Defendants do not dispute the authenticity of any of this evidence.

Nor does the written policy support the one-hour limitation. In fact the policy regarding religious services states that they are scheduled for a minimum of 90 minutes unless a shorter duration is requested by volunteers and the policy regarding visits says nothing about length. As noted, there is evidence that Plaintiff was previously allowed two-hour visits by the Chaplains' office. (*Id.*)

Defendants do not suggest, much less offer evidence, that Fr. Paisios has not been accredited as a religious leader or that there were problems regarding the previous visits either with security or burdensome scheduling.

1    The other justification offered by Defendants is that they would be overwhelmed by the requests from inmates to have religious visitors more than once a month.[9] There is a dispute of fact regarding whether the previous visits were arranged through the chaplains' office, although Plaintiff submits e-mail correspondence showing that they were. More important, Defendants offer little in the way of explanation why they objected to pastoral visits arranged through the visitors' office. They simply assert that they stopped them because the policy is to allow all inmates one religious visit per month for one hour. But the law does not require that inmates be treated identically; rather all must be afforded reasonable opportunities to exercise their religious freedom. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). Moreover, although Defendants suggest that if Plaintiff wants additional visits from Fr. Paisios, he could be placed on Plaintiff's visitation list as a regular visitor, the written policy appears to prohibit this. And it is unclear how this would differ from the practice to which prison officials objected and put a stop. Furthermore, Defendants do not explain why arranging additional visits in this way is less burdensome to ADC than arranging them through the chaplains' office. It is also unclear whether these additional visits would permit taking of sacraments.

In addition, the evidence on the alleged burden to the chaplains' office is conclusory and speculative. As noted, in *Warsoldier* the Ninth Circuit reversed the denial of a preliminary injunction to an inmate who challenged California prison officials' grooming policy limiting hair length to three inches. 418 F. 3d at 1002. In support of the California policy, prison officials advanced security reasons. The court noted that the issue was not whether security is a compelling government interest—it is. *Id.* at 998. Rather, the issue was whether the California prison's grooming policy was the least restrictive means to achieve its compelling interest. *Id.* The court held that prison officials had not met their burden.

First, the court found that the prison had presented only conclusory statements that

---

[9] Although Defendants allude to security concerns, they offer no evidence on this point except to say that one staff member must be present per religious visit.

- 15 -

the grooming policy was the least restrictive means to achieve its interests. The prison had alleged that "[a]ll other modes of regulation would either overly burden the inmate or the penal institution, or conversely fail to meet the compelling penological interests achieved by the grooming standards" but it had not elaborated on this or what else it had considered and rejected. The court also held that even outside the context of a minimum-security facility, prison officials cannot meet their burden to prove least restrictive means unless they "demonstrate that they have actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Id.* at 999.

Here, the Court finds that, assuming that administrative needs of the chaplains' office are a compelling government interest for limiting the pastoral visitation policy, Defendants have not met their burden to show they used the least restrictive means to achieve the compelling interest. "[I]n light of RLUIPA, no longer can prison officials justify restrictions on religious exercise by simply citing to the need to maintain order and security in a prison. RLUIPA requires more." *Greene v. Solano County Jail*, 513 F.3d 982, 989-90 (9th Cir. 2008). Prison officials must show that they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Id.* at 990 (quoting *Warsoldier*, 418 F.3d. The record in the present case shows that for an extended period, Plaintiff was permitted to receive pastoral visits at least two times per month for up to two hours. Plaintiff's evidence shows that Fr. Paisios scheduled the visits through the chaplains' office in blocks of time, which does not appear burdensome to the Court. And Defendants have failed to show that they considered scheduling additional pastoral visits through other means, as Linderman claims was done in the past.

The Court finds that Plaintiff demonstrates a likelihood of success on the merits.

### 2. **Irreparable Harm**

To meet the "irreparable harm" requirement, Plaintiff must do more than simply allege imminent harm; he must demonstrate it. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). In *Warsoldier*, the court concluded that the

"loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the issuance of a preliminary injunction. *Warsoldier*, 418 F.3d at 1002 (quotation omitted). Because Plaintiff has shown a likelihood of success on the merits of his claim, he has satisfied the irreparable injury requirement.

### 3. Balance of Equities

To assess whether Plaintiff has shown that the balance of equities tips in his favor, the Court must "balance the interests of all parties and weigh the damage to each." *See L.A Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1203 (9th Cir. 1980). As articulated above, Plaintiff is likely to suffer irreparable injury. Defendants do not directly address the balance of the equities. Because this preliminary injunction addresses only the rights of Plaintiff under the particular facts of this case, the Court finds that the balance of equities tips in Plaintiff's favor.

### 4. Public Interest

Finally, the public interest analysis requires the Court to consider "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Indep. Living Center of Southern Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009). It is well settled that upholding First Amendment principles is a significant public interest. *See Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). Thus, an injunction for additional pastoral visits is in the public interest.

### 5. No Security Required

The Court finds it appropriate to waive the bond requirement of Federal Rule of Civil Procedure 65(c). Plaintiff is an inmate, and it would be unjust to require security in this case. *See Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (district court has discretion as to the amount of security, if any).

## V. Conclusion

For the foregoing reasons, the Court concludes that Plaintiff has established that

- 17 -

he is entitled to injunctive relief and that the law and facts clearly favor him. The Court will therefore direct that, within 10 days, Defendants must allow Plaintiff to receive religious visits two times per month for up to two hours so there is the opportunity to participate in sacraments. Pursuant to 18 U.S.C. § 3626(a)(1)(A), the Court certifies that the relief provided herein is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Plaintiff's Motion for Preliminary Injunction (Doc. 5), Plaintiff's Motion for Default (Doc. 14), and Plaintiff Motion for Preliminary Injunction (Doc. 22).

(2) Plaintiff's Motion for Preliminary Injunction (Doc. 5) is **granted to the extent that** the Court directs Defendants to allow Plaintiff to receive pastoral visits from a Greek Orthodox pastor two times per month for up to two hours. The Court **denies the request for weekly visits**.

(3) Plaintiff's Motion for Default (Doc. 14) is **denied**, and Plaintiff Motion for Preliminary Injunction (Doc. 22) is **denied as moot**.

Dated this 12th day of September, 2013.

James A. Teilborg
Senior United States District Judge