WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Frank Jarvis Atwood,

           Plaintiff,

v.

David Shinn, et al.,

           Defendants.

No. CV-22-00625-PHX-JAT (JZB)

**PRELIMINARY INJUNCTION**

Plaintiff Frank Atwood is scheduled to be executed on June 8, 2022.  Plaintiff initially filed this action to compel officials of the Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR) to allow his Greek Orthodox priest, Father Paisios, to be present at Plaintiff's side during his execution to pray and administer last rites, including placing his hands on Plaintiff and speaking to him directly, to accommodate Plaintiff's religious exercise.  The Court ordered expedited service and Defendants moved to dismiss Plaintiff's Complaint as moot, contending that ADCRR's execution protocol, DO 710, was amended to expressly allow the religious accommodation sought by Plaintiff.  Plaintiff filed a First Amended Complaint, contending that the amended protocol does not provide Plaintiff with the opportunity to undergo a tonsure ceremony or to have his last rites performed.

Defendants moved to dismiss Plaintiff's First Amended Complaint and Plaintiff filed a Motion for Preliminary Injunction.

## I.      Background

Plaintiff alleges the following in his First Amended Complaint.  On May 3, 2022, the Arizona Supreme Court issued a warrant for Plaintiff's execution, scheduled for June 8, 2022.  (Doc. 14 ¶ 6).

For over two decades, Plaintiff has been a devout practitioner of the Greek Orthodox faith, observing a strict schedule of prayer and study at the direction of his priest, Father Paisios, Abbot of the St. Anthony's Greek Orthodox Monastery in Florence, Arizona.  (*Id.* ¶ 1).  Father Paisios baptized Plaintiff into the faith in July 2000 and has ministered to Plaintiff regularly for many years.  (*Id.*)

Plaintiff's faith requires that when the State carries out his execution, Father Paisios be permitted to stay by his side and to pray and administer last rites, including placing his hands on Plaintiff and speaking to him directly.  (*Id.* ¶ 2).  In January 2022,  Plaintiff began the grievance process by submitting an informal complaint asking ADCRR to accommodate this exercise of his religion during his execution, but ADCRR denied the request for Father Paisios to be present during his execution by lethal injection, without explaining why it cannot accommodate this exercise of Plaintiff's religious beliefs.  (*Id.* ¶¶ 2, 4, 41).  Plaintiff's faith also requires that Father Paisios be with Plaintiff for one hour on the day of, but prior to, the execution, to tonsure Plaintiff as an Orthodox monk prior to his death.  (*Id.* ¶ 3).

In the event Plaintiff elects to be executed by lethal gas, Plaintiff has advised ADCRR that once he is secured within the gas chamber, his spiritual advisor needs access to Plaintiff long enough to administer last rites through prayer and to place his liturgical vestment upon Plaintiff immediately prior to the securing of the chamber and release of lethal gas.[1]  (*Id.* ¶ 5).  Once he exits the chamber, the spiritual advisor needs to remain in the execution room to communicate with Plaintiff through a viewing portal of the chamber while the gas is administered and until Plaintiff's death.  (*Id.*)  ADCRR has not responded to this request.  (*Id.*)

___

[1] Plaintiff states he has not yet elected the method of his execution.  (Doc. 14 at 3 n.1.)  The State maintains Plaintiff will be executed by lethal injection.

According to Plaintiff, ADCRR has a history of struggling to conduct humane executions, which heightens the gravity of Plaintiff's right to religious exercise because last rites for the Greek Orthodox are more important in a death that is difficult than one that passes peacefully.  (*Id.* ¶¶ 28, 32). The presence of a spiritual advisor is greatest in the event of an inhumane and/or extremely painful execution because "there would be no repairing the spiritual damage done to [Plaintiff] in the final moments of his life."  (*Id.* ¶ 32).

After this lawsuit was filed, on April 20, 2022, ADCRR's Execution Protocol, found in Department Order (DO) 710, was revised to allow for a spiritual advisor to be in the execution chamber during a lethal injection execution, to touch the condemned prisoner, and to pray aloud during the process of killing the prisoner.  (*Id.* ¶ 33).  However, the amended Execution Protocol also states, "the Department reserves the right to enforce as necessary any or all reasonable restrictions on the audible prayer and religious touch as set forth in the U.S. Supreme Court's Opinion" in *Ramirez v. Collier* (March 24, 2022).  (*Id.* ¶ 34).  Plaintiff claims that this proviso permits ADCRR "unfettered discretion . . . to unconstitutionally discriminate based upon anything, everything, or nothing at all" and makes it impossible for Father Paisios to plan and perform last rites "in a manner that ensures he can complete them without being cut off or interrupted."  (*Id.* ¶ 35).  Nor does the amended Execution Protocol indicate that ADCRR will accommodate the tonsure rites that will take approximately one hour prior to Plaintiff's execution, and the amended protocol does not address whether or how Father Paisios will be permitted to participate if Plaintiff chooses lethal gas.  (*Id.* ¶¶ 36, 37).

Executing Plaintiff without a protocol that spells out the procedures and actions of each participant "would create an objectively intolerable risk of harm due to a lack of procedures contemplating who, as a spiritual advisor, is permitted to be where and when, and what such an advisor is permitted to do, risking miscommunication, error, and disruption of the execution process."  (*Id.* ¶ 39 (citing *Ramirez*, Slip Op. at 21)).

In sum, ADCRR's Execution Protocol does not ensure Plaintiff's religious exercise

will be accommodated and permit his tonsure, complete last rites without interruption, or last rites in a lethal gas execution.  (*Id.* ¶ 40).

Count One asserts a violation of the First Amendment's establishment clause because ADCRR's Execution Protocol "is not neutral toward religion and evinces a hostility toward religion generally."  (*Id.* at 14).

Count Two asserts a violation of the First Amendment's free exercise clause because the Execution Protocol "unjustifiably interferes with [Plaintiff's] ability to practice his religion."  (*Id.* at 15).

Count Three asserts a violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA) because "the restrictions and lack of accommodations in ADCRR's current Execution Protocol places a substantial burden on [Plaintiff's] exercise of a sincerely held religious belief and is not the least restrictive means of furthering a compelling government interest."  (*Id.* at 17).

Plaintiff seeks declaratory relief and an injunction requiring ADCRR to amend its Execution Protocol prior to executing Plaintiff in a manner that accommodates Plaintiff's exercise of religion by specifying the means by which ADCRR will accommodate the hour-long tonsure process on the morning of the execution and the complete administration of last rites by Plaintiff's spiritual advisor for both lethal injection and lethal gas options; and to stay Plaintiff's execution until the Execution Protocol is amended in accordance with the Constitution, RLUIPA, and federal law and the Court confirms this compliance in a declaratory judgment.

Defendants moved to dismiss and for failure to state a claim, arguing Plaintiff's claims were not yet ripe because "ADCRR has not denied his request to receive tonsure or last rites" and Defendants believed the protocol would permit sufficient time to accommodate Plaintiff's requested religious exercise.  (Doc. 19 at 5).  Alternatively, Defendants contend Plaintiff lacks standing because his claim that ADCRR's protocol "fails to ensure" does not reflect that Plaintiff will experience a substantial burden on his religious exercise.  (Doc. 19 at 7).  Finally, Defendants contend Plaintiff failed to exhaust

his administrative remedies.

Because it appeared as though Defendants were prepared to accommodate Plaintiff's religious exercise prior to and during his execution, the Court directed the parties to submit to the Court a proposed form of injunction delineating the specific parameters of any religious visits prior to Plaintiff's execution and conduct during Plaintiff's execution. If the parties had any remaining disagreements, they were directed to file a Notice setting forth those remaining disputes.

The parties filed the requisite Notice on June 1, 2022.  Defendants stated that they agree to the following accommodations to Plaintiff's religious exercise requests and would consent to an injunction containing these terms:

1. ADCRR shall permit Plaintiff's spiritual advisor to have limited contact visitation with Plaintiff between the hours of 7:00 a.m. and 9:00 a.m. on the morning of June 7, 2022 for purposes of religious exercise, including performing tonsure and last rites, all of which must be completed by 9:00 a.m. ADCRR will require Plaintiff to be restrained in a restraint chair, outside the cell, during this time.

2. ADCRR shall provide Plaintiff's spiritual advisor with electric clippers to use in performing the tonsure. ADCRR shall allow the spiritual advisor to recite prayers, place ceremonial garments on Plaintiff, trim a lock of Plaintiff's hair, and bring an assistant (an additional priest from St. Anthony's monastery, whose name will be submitted at least one week prior to the execution), with his traditional vestments, to serve as a chanter during the tonsure. ADCRR shall also allow Plaintiff's spiritual advisor to bring in a ceremonial vestment to be worn by Plaintiff for the tonsure, and Plaintiff will be permitted to wear this vestment during the ceremony. Permissible elements of this vestment shall be limited to an outer garment/robe ("zostiko"), short vest ("kondo"), covering made of thin cords woven into crosses ("polystavros"), hat ("Skoufos"), veil ("Koukouli"), scapular ("Great Schema"), belt, and shoes. ADCRR shall also permit Plaintiff's spiritual advisor to lay hands on Plaintiff's head, place a garment across Plaintiff's head, shoulders, and/or torso, and anoint Plaintiff with oil during the tonsure ceremony.

3. ADCRR shall permit Plaintiff's spiritual advisor to lay hands on Plaintiff's head and place a last rites garment across Plaintiff's shoulders. In performing last rites, ADCRR shall allow the spiritual advisor to wear his usual vestments, including his stole,

- 5 -

and to bring in three small spiral bound service books containing prayers, a vial of sacramental oil, a vial of holy water, a handheld cross, a small prayer rope, and a candle. ADCRR shall provide matches or a lighter to light the candle.

4. ADCRR shall permit Plaintiff's spiritual advisor to accompany Plaintiff when Plaintiff is escorted into the lethal injection chamber.

5. While in the lethal injection chamber, ADCRR shall permit Plaintiff's spiritual advisor to touch Plaintiff on the ankle or foot. ADCRR may require Plaintiff's spiritual advisor to comply with all lawful directives of ADCRR personnel to: (a) touch Plaintiff only on the ankle or foot; (b) stand in a location that gives the medical team an unobstructed view of the IV lines; (c) terminate touching Plaintiff on the ankle or foot during critical points in the execution process, such as during insertion of the IV line; and (d) immediately leave the lethal injection chamber upon ADCRR personnel determining that he has failed to comply with any of these requirements.

6. While in the lethal injection chamber, ADCRR shall permit Plaintiff's spiritual advisor to engage in audible prayer. ADCRR may require Plaintiff's spiritual advisor to comply with all lawful directives of ADCRR personnel to (a) limit the volume of any prayer so that medical officials can monitor Plaintiff's condition; (b) remain silent during critical points in the execution process, including when an execution warrant is read or when ADCRR personnel and/or medical personnel must communicate with one another; (c) speak only to Plaintiff; and (d) immediately leave the lethal injection chamber upon ADCRR personnel determining that he has failed to comply with any of these requirements.

7. All persons and items entering and ADCRR facility shall be subject to standard security inspection protocols.

Pursuant to the parties' agreement, the Court will enter an injunction requiring the Defendants to comply with all items to which they have agreed, subject to the modifications articulated in the conclusion of this Injunction.

The parties further identified three remaining requests that Defendants claimed they could not accommodate:

1. Requiring the use of a restraint chair (vs. wheelchair and leg shackles) during the tonsure ceremony.

2. Limiting touch to the feet and ankles, with no qualification for how

Plaintiff is ultimately positioned.

3. Disallowing the use of the priestly stole inside the execution chamber.

Based on the remaining areas of disagreement Plaintiff filed a Motion for Emergency Preliminary Injunction seeking an order compelling Defendants to allow Plaintiff to participate in his tonsure ceremony from his wheelchair instead of chained to a restraint chair and permitting his spiritual advisor to administer the priestly stole over his head while in the execution chamber.

## II.   Motion to Dismiss

Defendants' Motion to Dismiss must be denied.  While Defendants maintain that Plaintiff's claims in his First Amended Complaint are speculative, they have opposed crucial aspects of Plaintiff's requests for religious accommodation through this accelerated litigation.  Any assertion of lack of ripeness or lack of standing, therefore, are not well-taken.

As for exhaustion, Defendants assert that it is clear from the face of Plaintiff's Amended Complaint that he failed to exhaust his available administrative remedies.  In his Amended Complaint, Plaintiff alleged that he had fully exhausted his available administrative remedies.  Specifically, Plaintiff alleged that:

(1)     On January 2, 2022, Plaintiff submitted an informal complaint through the prison's complaint system stating that his lawyers had been told Fr. Paisios would be allowed in the witness room only, and his "religious beliefs require Father Paisios to stay by [his] side during [his] execution and to pray and administer last rites, including placing his hands on [him] and speaking to [him]."

(2)     On January 18, 2022, he received a response that "710—Execution Procedures 2.1.3.1.1 inform the inmate that two clergy and five other persons may be invited to be present at the execution. Policy allows for clergy to be present as a witness during execution but does not give permission to allow clergy to be at your side during execution. Your request to have clergy at your side during execution cannot be resolved at my level."

(3)     On January 19, 2022, he filed a formal grievance, stating, "As stated in the Informal Complaint Resolution, my religious needs require that during my execution, and at the time of my death, that I am able to speak directly with my priest and am able to have him lay hands on me. ADCRR Dept. Order 710 fails to provide these essential religious necessities and therefore violates my constitutional (1st Amendment) and congressional (RLUIPA) rights to freely exercise my religion."

(4)     On February 2, 2022, Plaintiff received a response to his grievance, stating that it was "unprocessed." The response explained, "This is in the ARS codes. Your Inmate Grievance for this case was unprocessed due to judicial proceedings or decision of the courts. You cannot submit a grievance appeal."

(5)     On February 6, 2022, Plaintiff nonetheless submitted an appeal, but received no response. (Doc. 14 ¶¶ 41-47).

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The

ultimate burden, however, rests with the defendant.  *Id.*

Defendants assert that it is clear from the face of Plaintiff's Amended Complaint that he did not properly exhaust available administrative remedies because "Plaintiff fails to demonstrate how an unrelated grievance, filed before ADCRR revised its execution protocol, has any bearing on the claims in his amended complaint."  (Doc. 19 at 8.) Defendants then argue several policy reasons why they believe Plaintiff should be required to exhaust prior to bringing this claim.  Notably, Defendants include no details about the available administrative remedy at issue and appear to attempt to shift the burden to Plaintiff at the outset.  This is improper.  Defendants bear the initial burden of demonstrating that there was an available administrative remedy and that Plaintiff did not follow it.  Defendants did not attach the relevant administrative remedy or discuss the provisions of the administrative remedy or how it would apply to Plaintiff.

Moreover, the protocol that Plaintiff now challenges was revised by the ADCRR on April 20, 2022.  (Doc. 10 at 3.)  Defendants do not explain what administrative remedy is in place that would allow Plaintiff to grieve the newly revised protocol prior to his execution on June 8, 2022.[2]

For the foregoing reasons, Defendants have not met their burden of showing that an administrative remedy was available to Plaintiff.[3]

/ / /

/ / /

---

[2] Even if Defendants *meant* to argue that Department Order 802 provides an available administrative remedy, Department Order 802 allows 120 days for completion of the grievance process and there is no explanation how that is an available remedy for Plaintiff, who seeks to have such an issue decided prior to his execution. *See, e.g., Kleinfelt v. Shinn*, No. CV 20-793-PHX-JAT(JFM), 2021 WL 1376095, at *2 (D. Ariz. Apr. 12, 2021) (Department Order 802, Inmate Grievance Procedure, (effective Oct. 16, 2016), provides that the maximum length of time for completion of the grievance process is 120 days from initiation of the Formal Grievance Process.).

[3] Because Defendants have not met their burden, the Court does not address Plaintiff's argument that the administrative remedy was rendered effectively unavailable based on information he received in a previous grievance response.

1     **III.   Legal Standard**

2        **A.  Preliminary Injunction**

3         "A preliminary injunction is 'an extraordinary and drastic remedy, one that should

4  not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"

5  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520

6  U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555

7  U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy

8  never awarded as of right").  A plaintiff seeking a preliminary injunction must show that

9  (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without

10  an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the

11  public interest.  *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are

12  'serious questions going to the merits'—a lesser showing than likelihood of success on the

13  merits—then a preliminary injunction may still issue if the 'balance of hardships tips

14  sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Shell*

15  *Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance*

16  *for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Under this serious

17  questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger

18  showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at

19  1072.

20         Regardless of which standard applies, the movant "has the burden of proof on each

21  element of the test."  *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016,

22  1027 (E.D. Cal. 2000).  Further, there is a heightened burden where a plaintiff seeks a

23  mandatory preliminary injunction, which should not be granted "unless the facts and law

24  clearly favor the plaintiff."  *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th

25  Cir. 1986) (citation omitted).

26         The Prison Litigation Reform Act imposes additional requirements on prisoner

27  litigants who seek preliminary injunctive relief against prison officials and requires that

28  any injunctive relief be narrowly drawn and the least intrusive means necessary to correct

1    the harm.  18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal*., 220 F.3d 987,

2    999 (9th Cir. 2000).

3        **B.    RLUIPA**

4        Under RLUIPA, a government may not impose a substantial burden on the religious

5    exercise of a confined person unless the government establishes that the burden furthers a

6    "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C.

7    § 2000cc-1(a)(1)-(2). This "compelling government interest" and "least restrictive means"

8    test replaced *Turner*'s "legitimate penological interest" test.  *Warsoldier v. Woodford*, 418

9    F.3d 989, 994 (9th Cir. 2005) (citing 42 U.S.C. § 2000cc-1(a)).   The Ninth Circuit has

10   explained that, under RLUIPA, prison officials cannot "justify restrictions on religious

11   exercise by simply citing to the need to maintain order and security in a prison.  RLUIPA

12   requires more." *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 989-90 (9th Cir. 2008).  Prison

13   officials must show that they "actually considered and rejected the efficacy of less

14   restrictive measures before adopting the challenged practice."   *Id.* at 990 (quoting

15   *Warsoldier*, 418 F.3d at 999).  Under its own terms, RLUIPA must be "construed broadly

16   in favor of protecting an inmate's right to exercise his religious beliefs." *Warsoldier* at 995

17   (citing 42 U.S.C. § 2000cc-3(g)).

18       RLUIPA was enacted to provide "very broad protection for religious liberty"; it

19   "protects 'any exercise of religion, whether or not compelled by, or central to, a system of

20   religious belief[.]'"  *Holt v. Hobbs*, 574 U.S. 352, 356, 358 (2015) (quoting 42 U.S.C.

21   § 2000cc–5(7)(A)); *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (RLUIPA

22   must be "construed broadly in favor of protecting an inmate's right to exercise his religious

23   beliefs").  Under RLUIPA, a prisoner must show that the relevant exercise of religion is

24   grounded in a sincerely held religious belief and not some other motivation.  *Holt*, 574 U.S.

25   at 360-61.  Next, the inmate bears the burden of establishing that a prison policy constitutes

26   a substantial burden on that exercise of religion.  *Id.*; *Warsoldier*, 418 F.3d at 994 (citing

27   42 U.S.C. § 2000cc-2(b)).  If the inmate makes those two showings, the burden shifts to

28   the government to prove that the substantial burden on the inmate's religious practice both

1    furthers a compelling governmental interest and is the least restrictive means of doing so.
2    *Warsoldier*, 418 F.3d at 995.

3        The prisoner bears the burden of establishing prima facie that RLUIPA has been
4    violated and that his religious exercise has been substantially burdened. *Id.* at 994 (citing
5    42 U.S.C. § 2000cc-2(b)). The government then bears the burden of proving that the
6    substantial burden on the inmate's religious practice both furthers a compelling
7    governmental interest and is the least restrictive means of doing so. *Id.* at 995 (citing 42
8    U.S.C. §§ 2000cc-1(a), 2000cc-2(b)). "If prison officials meet that standard, the prison
9    regulation passes muster under RLUIPA, regardless of the burden it imposes on religious
10   exercise." *Greene*, 513 F.3d at 990.

11   **IV.    Discussion**

12       **A.    Plaintiff's Placement During Tonsure Ceremony**

13       Plaintiff contends that while Defendants will allow Plaintiff to "don the ceremonial
14   garb, however it will be impossible for him to do so if he is ankle chained, belly chained,
15   chest strapped, and wrist chained into a restraint chair." Plaintiff further contends "the
16   ceremony has specific, prescribed elements—including the wearing of vestments and the
17   cutting of a lock of hair—that are mandatory; it cannot be conducted in a manner the
18   religion would consider effective without the required elements." As a result, Plaintiff
19   requests that he be permitted to undergo the tonsure ceremony from his wheelchair.

20       Defendants respond that Plaintiff does not adequately explain how he will
21   specifically be prevented from fully participating in the tonsure ceremony from a restraint
22   chair, Defendants argue Plaintiff has not established a substantial burden.

23       The Court disagrees with Defendants. Plaintiff has indicated that he is unable wear
24   the "various elements of the habit or vestment worn by Orthodox monks" if he is chained
25   to a restraint chair. The Court finds that Plaintiff has alleged a substantial burden.

26       Because Defendants limited their argument to Plaintiff's substantial burden, they do
27   not argue a compelling government interest beyond "security" that justifies requiring a
28   restraint chair as opposed to Plaintiff's wheelchair. But Plaintiff's counsel's description of

- 12 -

1  Plaintiff's infirmities seems to not be in dispute, is consistent with evidence in other cases
2  before the undersigned, and belies Defendants' "security" concerns.  Thus, the Court finds
3  that Plaintiff is entitled to an injunction authorizing him to participate in his tonsure
4  ceremony from his wheelchair.

5        **B.**      **Administration of Last Rites and Placing of Priestly Stole**

6        As part of the administration of last rites, Plaintiff's spiritual advisor must place the
7  stole (a cloth scarf) over Plaintiff's head while Plaintiff confesses, and the spiritual advisor
8  orally prays.  If last rites are administered prior to Plaintiff entering the execution chamber,
9  Plaintiff contends it would be impossible for him to wear the stole "*during* the actual time
10 his immortal soul is passing from his body."  (Doc. 39 at 2).  As a result, Plaintiff requests
11 that his spiritual advisor be permitted to place the stole over Plaintiff in the execution
12 chamber.  Defendants will accommodate the spiritual advisor in the execution chamber,
13 but maintain that the priest must remain at Plaintiff's feet.  Plaintiff asserts the priest could
14 remain stationary at Plaintiff's head to avoid any interference with the administration of
15 the lethal injection drugs and staff members ability to visualize the IV lines.

16       Defendants contend that while placing the priest at Plaintiff's head would resolve
17 the potential problems associated with him moving about the chamber during the
18 execution, it nevertheless implicates the "compelling government interest" in "preventing
19 accidental interference with the prison's IV lines," which was recognized by the Supreme
20 Court. *Ramirez*, 142 S. Ct. at 1281.

21       There does not appear to be any dispute that the priest will remain stationary during
22 Plaintiff's execution.  The only question left to be resolved is whether he stands at
23 Plaintiff's head or Plaintiff's feet.  Nothing Defendants have briefed compel the conclusion
24 that there is a meaningful difference where the priest stands as long as he remains
25 stationary.  In other words, Defendants have not demonstrated that they have a compelling
26 government interest to force the priest to stand at Plaintiff's feet during the entire execution.
27 A lesser restrictive alternative, remaining at Plaintiff's head, will accommodate
28 Defendants' interest in ensuring no one interferes with the placement of IV lines during the

1    execution.

2            The Court will therefore grant Plaintiff's Motion for Preliminary Injunction.

3    **IT IS THEREFORE ORDERED:**

4        1.  Defendants' Motion to Dismiss (Doc. 19) is **denied**.

5        2.  Plaintiff's Motion for Preliminary Injunction (Doc. 28) is **granted** as follows.

6        3.  The Court hereby enters a preliminary injunction compelling Defendants as follows:

            a.  ADCRR shall permit Plaintiff's spiritual advisor to have limited contact visitation with Plaintiff between the hours of 7:00 a.m. and 9:00 a.m. on the morning of June 7, 2022 for purposes of religious exercise, including performing tonsure and (some of) last rites, all of which must be completed by 9:00 a.m. Plaintiff is permitted to remain in his wheelchair during this time.

            b.  ADCRR shall provide Plaintiff's spiritual advisor with electric clippers to use in performing the tonsure. ADCRR shall allow the spiritual advisor to recite prayers, place ceremonial garments on Plaintiff, trim a lock of Plaintiff's hair, and bring an additional priest from St. Anthony's monastery, with his traditional vestments, to serve as a chanter during the tonsure. ADCRR shall also allow Plaintiff's spiritual advisor to bring in a ceremonial vestment to be worn by Plaintiff for the tonsure, and Plaintiff will be permitted to wear this vestment during the ceremony. Permissible elements of this vestment shall be limited to an outer garment/robe ("zostiko"), short vest ("kondo"), covering made of thin cords woven into crosses ("polystavros"), hat ("Skoufos"), veil ("Koukouli"), scapular ("Great Schema"), belt, and shoes. ADCRR shall also permit Plaintiff's spiritual advisor to lay hands on Plaintiff's head, place a garment across Plaintiff's head, shoulders, and/or torso, and anoint Plaintiff with oil during the tonsure ceremony.

            c.  ADCRR shall permit Plaintiff's spiritual advisor to lay hands on Plaintiff's head and place a last rites garment across Plaintiff's head. In performing the tonsure and (some of) last rites ceremony on June 7, 2022, ADCRR shall allow the spiritual advisor to wear his usual vestments, including his stole, and to bring in three small spiral bound service books containing prayers, a vial of sacramental oil, a vial of holy water, a handheld cross, a small prayer rope, and a candle. ADCRR shall provide matches or a lighter to light the candle.

            d.  ADCRR shall permit Plaintiff's spiritual advisor to accompany Plaintiff when Plaintiff is escorted into the lethal injection chamber.

            e.  While in the lethal injection chamber, ADCRR shall permit Plaintiff's spiritual advisor to touch Plaintiff on the head. ADCRR may require

- 14 -

Plaintiff's spiritual advisor to comply with all lawful directives of ADCRR personnel only to: (a) touch Plaintiff only on the head; (b) stand in a location that gives the medical team an unobstructed view of the IV lines; (c) terminate touching Plaintiff during critical points in the execution process, such as during insertion of the IV line; and (d) immediately leave the lethal injection chamber upon ADCRR personnel determining that he has failed to comply with any of these requirements.

f.   While in the lethal injection chamber, ADCRR shall permit Plaintiff's spiritual advisor to engage in audible prayer. ADCRR may require Plaintiff's spiritual advisor to comply with all lawful directives of ADCRR personnel to (a) limit the volume of any prayer so that medical officials can monitor Plaintiff's condition; (b) remain silent during critical points in the execution process, including when an execution warrant is read or when ADCRR personnel and/or medical personnel must communicate with one another; (c) speak only to Plaintiff; and (d) immediately leave the lethal injection chamber upon ADCRR personnel determining that he has failed to comply with any of these requirements.

g.   All persons and items entering an ADCRR facility shall be subject to standard security inspection protocols.

h.   Defendants must permit Plaintiff to participate in his tonsure ceremony from his wheelchair.

i.   Defendants (as stated in Doc. 40 at 2) will permit Plaintiff and his priest with time to perform (some of) last rites, including communion and confession, before entering the execution chamber on the morning of the execution.

j.   Plaintiff's spiritual advisor accompanying him into the execution chamber must remain stationary at Plaintiff's head during the entirety of the execution and may place the stole on Plaintiff's head.

4.   This relief is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct the harm. *See* 18 U.S.C. § 3626(a)(2).

5.   Plaintiff is not required to post bond.

Dated this 6th day of June, 2022.

James A. Teilborg
Senior United States District Judge

- 15 -